[9 NYS3d 220]

CT INVESTMENT MANAGEMENT CO., LLC, Respondent-Appellant, v CHARTIS SPECIALTY INSURANCE COMPANY, Formerly Known as AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY, Appellant-Respondent.

First Department, May 12, 2015

1

**APPEARANCES OF COUNSEL**

*Cahill Gordon & Reindel LLP*, New York City (*Edward P. Krugman, Philip V. Tisne* and *Abigail Shechtman* of counsel), for appellant-respondent.

*Dickstein Shapiro LLP*, New York City (*Jared Zola, Kirk A. Pasich* and *Sandra S. Thayer*, of the California bar, admitted pro hac vice, of counsel), for respondent-appellant.

**OPINION OF THE COURT**

GONZALEZ, P.J.

In October 2006, a group of entities now represented by plaintiff agreed to lend $103 million to eight Mexican companies that sought assistance in the financing of time-shares at resort properties in Mexico (the borrowers). The borrowers executed a note indenture agreement (NIA) for $103 million and two promissory notes for $90,900,000 and $12,100,000. They also executed a "cash management agreement," which, along with the NIA, required them to make daily deposits of hotel revenue into specified accounts including: (i) an account in the United States for dollar-denominated rents from all properties (the Dollar Lockbox Account) and (ii) an account in Mexico for all pesos-denominated rents and over-the-counter rents (the Pesos Lockbox Account). Funds from both the Dollar and Pesos Lockbox Accounts were swept daily into a centralized account (the Cash Management Account) in New York and disbursed pursuant to the terms of the cash management agreement. A specific subaccount was set up within the Cash Management Account, denominated the debt service subaccount, to cover the borrowers' obligations under the loan. The Cash Management Account is controlled by plaintiff.

Two of the borrowers executed a guaranty agreement for the loan. By that agreement, the two agreed to assume full responsibility for payment and performance of the promissory notes and the NIA in the event, among other contingencies, of bankruptcy. Plaintiff has attempted unsuccessfully to recover its losses from the guarantors. This is because a stay issued on May 27, 2010, discussed infra, which froze the Cash Management Account, also suspended the enforcement of the guaranty agreement (*In re Cozumel Caribe, S.A. de C.V.*, 508 BR 330, 334 and n 5 [SD NY 2014]; *CT Inv. Mgt. Co., LLC v Carbonell*, 2012 WL 92359, 2012 US Dist LEXIS 3356 [SD NY, Jan. 11, 2012, No. 10 Civ 6872]).

In conjunction with the loan transaction, plaintiff's predecessors in interest obtained a political risk insurance policy from defendant that provided coverage for two types of losses: (1) losses caused by expropriatory acts by a foreign government; and (2) losses stemming from frozen currency transfers

or fixed or limited currency conversions.[1] The policy had an express exclusion for losses "caused by or resulting from . . . insolvency, bankruptcy or financial default . . . except where such financial default is directly caused by an Insured Event."

"Expropriatory Act" is defined in section 2.1 as:

"[A]n act . . . whether characterized as expropriation, confiscation, nationalization, requisition, or sequestration by law, order, military or administrative action of the Government of the Host Country . . . which:

"(a) prevents the Insured from receiving a Scheduled Payment from the Issuer; or . . .

"(c) causes the Issuer to fail to make a Scheduled Payment; or

"(d) effectively deprives the Insured of its fundamental rights as a creditor in respect of all or part of a Scheduled Payment that is otherwise in default for commercial reasons, including rights against collateral security and/or commercial guarant[e]es or repayment; or

"(e) effectively deprives the Issuer or the Insured of the use and control of funds . . . causing the Issuer to fail to make the Scheduled Payment."

The policy provides that such acts must be "violations of international law" or "if purported to be in accordance with local law, such local law has been *materially altered* to permit the Expropriatory Act since the inception date of the Policy" (emphasis added).

"Currency Inconvertibility and Non-Transfer" is defined in section 2.2 as:

"(a) any action or series of actions by the [Mexican government] that prevents the Insured or the Issuer from directly or indirectly:

"(ii) legally transferring outside of [Mexico] *the amount of [U.S. dollars] which constitutes a Scheduled Payment*" (emphasis added).

---

1. Defendant Chartis Specialty Insurance Company, formerly known as American International Specialty Lines Insurance Company, issued the political risk policy to LaSalle Bank. The policy identifies the "Initial Insured" as Bear Sterns, which was succeeded by U.S. Bank. Plaintiff has authority to bring this action against Chartis on behalf of U.S. Bank.

The term "Scheduled Payment" is defined as "the principal and earned interest amount due on the original repayment dates in accordance with the terms of the Indenture and/or, as the context may require, any part thereof."

As indicated, the policy contains an express exclusion, at section 4.12, for losses "caused by or resulting from . . . insolvency, bankruptcy or financial default of the Issuer, except where such financial default is directly caused by an Insured Event."

In April 2010, one of the borrowers, Cozumel Caribe, S.A. de C.V., initiated a voluntary insolvency proceeding (the Mexican Bankruptcy Proceeding) pursuant to the provisions of the Ley de Concursos Mercantiles (the Mexican Business Reorganization Act [MBRA]) in the Mexican District Court (the Concurso Court). Cozumel petitioned for, among other things, court approval of measures to protect it as well as certain other parties. On May 27, 2010, the Concurso Court approved Cozumel's application and entered an order, inter alia, imposing a stay and restricting plaintiff's access to the Lockbox Accounts and the Cash Management Account (the May 27 stay), accounts that were used to make payments under the loan agreements. Before the May 27 stay (which remains in place), the borrowers had made every payment required under the terms of the loan agreement. However, on June 11, 2010, they defaulted on a payment under the NIA. On June 25, 2010, plaintiff sent the borrowers a notice of default on the loan.

Plaintiff's attempts to obtain a temporary and immediate suspension of the May 27 stay were unsuccessful. On September 30, 2010, the Concurso Court issued a resolution declaring Cozumel in concurso mercantil (in bankruptcy proceedings).

In November 2012, the United States Bankruptcy Court for the Southern District of New York issued an injunction freezing Cozumel's property in the United States, including all funds in the Dollar Lockbox Account and the Cash Management Account (see In re Cozumel Caribe, S.A. de C.V., 482 BR 96, 99 [SD NY 2012]). The court cited to its prior unpublished opinion, dated October 20, 2010, granting recognition of the Mexican Bankruptcy Proceeding under chapter 15 of the Bankruptcy Code (11 USC § 1521) (see In re Cozumel Caribe, S.A. de C.V., 482 BR at 99 [describing terms of Oct. 20, 2010 "Recognition Order"]). On November 11, 2010, the Federal Bankruptcy Institute appointed a mediator to facilitate either reorganization or a bankruptcy adjudication for Cozumel. The initial mediation or reconciliation period of 185 days under the MBRA began on April 1, 2011.

On February 24, 2012, plaintiff made a formal claim for benefits under the policy. Defendant requested proof of loss, which was sent on April 26, 2012. On May 3, 2012, defendant denied the claim. The policy expired in October 2012. Cozumel remains in concurso mercantil.

By this action, plaintiff seeks a declaration that it is entitled to coverage under the policy. It also asserts causes of action for breach of section 2.1 of the policy (expropriation clause) and of section 2.2 of the policy (currency clause). We find that defendant has no duty to provide coverage to plaintiff because plaintiff's claims fall squarely within the bankruptcy exclusion set forth in section 4.12 of the policy.

Section 4.12 excludes from coverage any losses "caused by or resulting from . . . *insolvency, bankruptcy or financial default*" (emphasis added). Plaintiff argues that the exclusion is inapplicable because the term "bankruptcy" refers to a final adjudication liquidating or reorganizing an entity under the Bankruptcy Code. It contends that the concurso proceeding is not "bankruptcy," that the Mexican court has not declared Cozumel bankrupt, and that it can therefore assert claims for its losses under both the expropriation and currency clauses of the policy based upon the events that have taken place in Mexico.

We agree with defendant that plaintiff's definition of bankruptcy (a final judgment of reorganization or liquidation) is overly narrow. Bankruptcy is generally understood to include being under the judicial protection of a bankruptcy court—or, according to dictionary definition—"[a] statutory procedure by which a (usu[ally] insolvent) debtor obtains financial relief and undergoes a judicially supervised reorganization or liquidation . . . for the benefit of creditors" (Black's Law Dictionary 175 [10th ed 2014]; *see* Compact Oxford English Dictionary 934-935 [2d ed 1999] [same]).[2]

Plaintiff contends that since the parties have conflicting interpretations of the term "bankruptcy," the policy must be ambiguous on this point, and points out that settled principles of interpretation of insurance contracts require resolution of any ambiguity in favor of the insured (*Lavanant v General Acc. Ins. Co. of Am.*, 79 NY2d 623, 629 [1992]; *MDW Enters. v CNA Ins. Co.*, 4 AD3d 338, 340 [2d Dept 2004]). However, "provi-

---

2. "[I]t is common practice for the courts of this State to refer to the dictionary to determine the plain and ordinary meaning of words to a contract" (*2619 Realty v Fidelity & Guar. Ins. Co.*, 303 AD2d 299, 300-301 [1st Dept 2003] [internal quotation marks omitted]).

sions in a contract are not ambiguous merely because the parties interpret them differently" (*Mount Vernon Fire Ins. Co. v Creative Hous.*, 88 NY2d 347, 352 [1996]). Here, common understanding supports interpreting the term bankruptcy as the court proceeding in which the debtor is afforded judicial protection while it reorganizes or liquidates.

Further, settled law requires that the terms of a contract be read in context (*see e.g. Northville Indus. Corp. v National Union Fire Ins. Co. of Pittsburgh, Pa.*, 89 NY2d 621, 632-633 [1997]). Plaintiff's definition of bankruptcy, i.e., the state of having been declared bankrupt, would render the accompanying alternatives in section 4.12 of the policy (insolvency and financial default) superfluous. The redundancy can be eliminated only by accepting defendant's definition, an interpretation that gives meaning to every "sentence, clause, and word of [the] contract of insurance" (*id.* at 633 [internal quotation marks omitted]; 68A NY Jur 2d, Insurance § 859 at 399-400 [2010 ed]; *see also Hartford Acc. & Indem. Co. v United States Fid. & Guar. Co.*, 962 F2d 1484, 1489 [10th Cir 1992], *cert denied* 506 US 955 [1992]).

The policy at issue is a political risk insurance policy, not a credit insurance policy. If the lenders were concerned about the financial stability of one or more of the borrowers, they could have purchased credit insurance to protect them from the risk of a borrower's bankruptcy (*see e.g. Starlo Fashions v Continental Ins. Co.*, 185 AD2d 114, 115 [1st Dept 1992]). The parties, and their predecessors, are all sophisticated business entities, and the concern prompting the purchase of this insurance policy was the risk of lending in a foreign jurisdiction. The coverage clauses detail issues specific to the risks of lending in Mexico, and a "reasonable expectation" of the parties to this contract was that losses caused by bankruptcy were not covered under the policy.

Had we concluded that the bankruptcy exclusion did not preclude recovery, we would nevertheless find that plaintiff could not recover, since the events that occurred in Mexico do not trigger the expropriation clause or the currency clause of the policy. With regard to the expropriation clause, the application of Mexican law to Cozumel's case was not an "alteration" of local law to permit an Expropriatory Act. The Concurso Court's stay was not an alteration of Mexican law. The outcome of the proceeding may have had unfavorable repercussions for plaintiff, but it was not analogous to the passing of a new law

by a foreign legislative body or the nationalization of a private company by the executive. Moreover, in the Mexican legal system, which has its origins in the civil law system, judicial decisions do not have precedential effect except in very limited circumstances, not present here (*see* 1 Vargas, Mexican Law: A Treatise for Legal Practitioners and International Investors § 2.31 at 58 [1998]).

Section 2.2, the currency clause, covers losses caused by prohibitions on transfers of an "amount" of currency. The Mexican court did not impose any such limitations; it merely placed restrictions on certain accounts and suspended certain agreements surrounding the loan transaction. None of the borrowers are forbidden to transfer out of Mexico currency, in any amount, from any account that is not frozen. The stay does not constitute a government act prohibiting the transfer of "the amount of Policy Currency which constitutes a Scheduled Payment." As the Bankruptcy Court observed, "Nothing in the [May 27 order] relieved the [other borrowers] from the obligation to continue making debt servicing payments on the $103 million loan. Nevertheless, . . . [they] have simply stopped paying" (*In re Cozumel Caribe, S.A. de C.V.*, 482 BR at 112 n 14).

Finally, in view of our conclusion that the bankruptcy exclusion precludes plaintiff's claims, we make no determinations with respect to timeliness of the action or the sufficiency of plaintiff's proof of loss.

Accordingly, the order of the Supreme Court, New York County (Shirley Werner Kornreich, J.), entered May 6, 2013, which, to the extent appealed from as limited by the briefs, denied that portion of defendant's motion to dismiss seeking dismissal of plaintiff's currency clause claim, and granted that portion of the motion seeking dismissal of plaintiff's expropriation clause claim, should be modified, on the law, to grant the motion in its entirety, and to declare in defendant's favor that it has no duty to provide coverage under the political risk insurance policy at issue, and otherwise affirmed, without costs. The appeals from the orders of the same court and Justice, entered April 22, 2014 and July 2, 2014, which, respectively, denied defendant's motion to renew the motion to dismiss, and, to the extent appealable, denied defendant's motion to renew, should be dismissed, without costs, as academic.

FRIEDMAN, ANDRIAS, GISCHE and KAPNICK, JJ., concur.

Order, Supreme Court, New York County, entered May 6, 2013, modified, on the law, to grant the motion in its entirety,

and to declare in defendant's favor that it has no duty to provide coverage under the political risk insurance policy at issue, and otherwise affirmed, without costs. Orders, same court, entered April 22, 2014 and July 2, 2014, dismissed, without costs, as academic.